UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| DIANA L. VAIL, ) | |
|     Plaintiff, ) | |
| ) | |
|   vs. ) | 1:06-cv-544-RLY-TAB |
| ) | |
| RAYBESTOS PRODUCTS COMPANY, ) | |
|     Defendant. ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     Introduction**

Plaintiff, Diana L. Vail ("Plaintiff"), brought this suit against her former employer, Raybestos Products Company ("Defendant"), alleging that Defendant violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by failing to reinstate her after taking intermittent FMLA leave and terminating her without just cause as required under the collective bargaining agreement ("CBA") between Defendant and Plaintiff's union, the Paper, Allied-Industrial Chemical and Energy Workers International Union AFL-CIO, CLC.

Defendant now moves for summary judgment on Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56.  Plaintiff also sought to cross-move for partial summary judgment.  However, because Plaintiff missed the deadline for filing dispositive motions and provided no justifiable reason for her late filing, she was denied leave to file

her cross-motion. *(See* August 1, 2007, Entry, Docket # 56). With respect to Defendant's motion for summary judgment, the court **GRANTS** said motion for the reasons set forth below.

## II. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion. *Id*. at 247–48.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996). However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

**III.    Statement of Facts**[1]

1.   Plaintiff began working for Defendant in August 1988.  (Deposition of Diana L. Vail ("Vail Dep.") at 10, Plaintiff's Ex. A, Defendant's Ex. A).  At all times relevant to the present case, Plaintiff was a member of the Paper, Allied-Industrial, Chemical and Energy Workers International Union AFL-CIO, CLC ("Union").  (*See id.* at 111).

2.   Article IV, Section 15 of the CBA that governed Plaintiff's employment with Defendant, states:

> An employee shall lose his seniority and right to be on the seniority list: (f) If an employee requests and is granted a leave of absence from the Company and while on such leave of absence accepts and performs other gainful employment or **provides physical labor to operate** any type of business enterprise for profit unless specific permission has been granted in advance by the Company.  The Union will be notified when and why such special leaves are granted.

(Collective Bargaining Agreement ("CBA") at 32, Affidavit of Elizabeth Sowers

---

[1] In its Reply, Defendant seeks to strike the citation to Elizabeth Sowers' unofficial deposition included in Plaintiff's Response.  The official transcript of Sowers' deposition was not yet available from the court reporter when Plaintiff filed her Response.  Defendant objects to the use of the unofficial transcript primarily because Sowers requested the opportunity to review and sign her deposition pursuant to Federal Rule of Civil Procedure 30(e) and had not yet had the opportunity to do so when Plaintiff filed her Response.  On September 10, 2007, Plaintiff filed with the court the official copy of Sowers' deposition and an amended Response to Defendant's motion for summary judgment, which cited the page numbers of the official deposition copy.  Defendant did not object to the amended filing.
      As such, Defendant's motion to strike Plaintiff's citations to the unofficial transcript of Sowers' deposition is moot.  However, as the court finds Plaintiff's facts that cite to Sowers' deposition immaterial to the issues before the court on summary judgment, the court does not cite to either version of Sowers' deposition testimony.

("Sowers Aff.") Ex. A, Defendant's Ex. E) (emphasis in original).

3. Article III, Section 4 of the CBA states that upon termination for cause, if an employee has a grievance, he or she "shall file a written grievance with a member of the Union Bargaining Committee." (*Id.* at 13). The CBA sets forth a three-step grievance process that may result in arbitration if a resolution is not reached between Defendant and employee. (*Id.* at 11–12).

4. During the relevant period to this case, Plaintiff worked the third shift. (Vail Dep. at 47). The third shift began at 10:45 p.m. and ended at 6:45 a.m. the next morning.[2] (*Id.*). Although working third shift encompassed working two consecutive calendar days, Defendant designated the work day, for internal purposes, as the second calendar day over which the shift was scheduled. (*Id.* at 47–48).

5. In addition to working for Defendant, Plaintiff also worked part-time for her husband's lawn-mowing business during the "mowing months." (*Id.* at 20, 38). Plaintiff was paid by check for this work. (*Id.* at 43).

6. Plaintiff has had long-term problems with migraine headaches and high blood pressure. (Notes from Greenacres Family Practice ("Doctor Notes"), Plaintiff's Ex. E). As a result, Plaintiff sought and was approved for intermittent FMLA leave for both her migraine headaches and high blood pressure. (Defendant's Responses to Plaintiff's First Request for Admissions ("Defendant's Admissions")

---

[2] The CBA actually designates this as the first shift. (CBA at 34).

       Nos. 8, 9, Plaintiff's Ex. G).

7. When Plaintiff needed to use her intermittent FMLA leave for one of her ailments, she would call in before each shift she would miss. (Vail Dep. at 68).

8. From May through September 2005, Plaintiff took approximately thirty-three (33) days of FMLA leave due to her migraine headaches. (*See* Sowers Aff. at ¶ 8). When she took FMLA leave during this period, Plaintiff was absent at least three days at a time. (*Id.*).

9. Due to the frequency of Plaintiff's FMLA absences, Elizabeth Sowers ("Sowers"), Defendant's Director of Human Resources, began to suspect that Plaintiff was requesting FMLA leave for non-FMLA purposes (presumably, to work for her husband's lawn-mowing business). (*Id.* at ¶¶ 3, 9). Sowers decided to start monitoring Plaintiff's activities on days when she called in requesting FMLA leave for migraine headaches. (*Id.* at ¶ 9).

10. On the morning of October 6, 2005, between 8:00 a.m. and 8:30 a.m., Plaintiff saw her treating physician, Dr. Hussain. (Vail Dep. at 118; Deposition of Amber Hussain ("Hussain Dep.") at 52, Plaintiff's Ex. F). During that appointment, Dr. Hussain changed Plaintiff's blood pressure medication and instructed her not to work for the following 24 hours. (Hussain Dep. at 33, 58,).

11. After her appointment, Plaintiff filled the prescription for her new medication and went home to bed. (Affidavit of Diana Vail ("Vail Aff.") at ¶¶ 11–13, Plaintiff's Ex. H; CVS Receipt, Plaintiff's Ex. I).

12. Pursuant to Dr. Hussain's orders to be off work, Plaintiff called Defendant and requested FMLA leave for her October 7, 2005, shift (which would have been from 10:45 p.m. on October 6 until 6:45 a.m. on October 7). (Defendant's Admissions No. 14).

13. The next morning, on October 7, 2005, Plaintiff called Dr. Hussain's office at approximately 10:16 a.m. to fax Defendant a note certifying Plaintiff's absence from work during her October 7 shift, which had just ended. (Deposition of Lisa Blackford ("Blackford Dep.") at 15–16, Plaintiff's Ex. J). The note from Dr. Hussain was unnecessary to certify Plaintiff's leave for her October 7 shift the night before because Plaintiff had called before that shift started to seek leave. (*See* Sowers Aff. at ¶ 11).

14. The note faxed to Defendant stated: "[Patient] seen in office today 10-6-05, Blood Pressure elevated, [changed] medication. [Patient] is to be off work till pm of 10/7/05. Any Questions call 361-9930." (October 7, 2005, Doctor Note ("10/7/05 Note"), Plaintiff's Ex. K). The note was dated October 7, 2005. (10/7/05 Note).

15. Dr. Hussain explained the note indicated Plaintiff was to be off work until the "pm" of October 7 because Dr. Hussain knew that Plaintiff worked third shift, which started in the evening, and the note was intended for Defendant, her employer. (Hussain Dep. at 78). Dr. Hussain indicated that Plaintiff's restrictions after taking her new medication would have been up about 9:30 a.m. on October 7, 2005, approximately 24 hours after Plaintiff took her first dose of the medication.

(*Id.*).

16. Sowers interpreted this note sent by Dr. Hussain to mean that Plaintiff was requesting FMLA leave for her October 8, 2007, shift, which started the evening of October 7, since Plaintiff had already called on October 6 requesting FMLA leave for her October 7 shift. (Sowers Aff. at ¶ 11).

17. Plaintiff developed a migraine headache on the afternoon of October 7, 2005. (Vail Dep. at 91). Plaintiff then called Defendant at some point on October 7, 2005, to request FMLA leave for her October 8, 2005, shift (which would have lasted from 10:45 p.m. on October 7 until 6:45 a.m. on October 8) due to a migraine. (Defendant's Admissions No. 15).

18. On the morning of October 7, 2005, after Plaintiff requested FMLA leave on October 6 for her October 7 shift, Defendant decided to employ someone to observe Plaintiff. (Sowers Aff. at ¶¶ 9–10).

19. Sowers, Defendant's HR Director, called the Crawfordsville Police Department to conduct surveillance on Plaintiff the morning of October 7. (*Id.* at ¶ 10). Lieutenant (then Sergeant) Jeff Largent responded to the request and arrived at Plaintiff's residence at 8:00 a.m. that morning. (Report of Lt. Jeff Largent ("Lt. Largent Report") at 1, Plaintiff's Ex. L).

20. At about 10:25 a.m. on October 7, Lt. Largent saw Plaintiff walk out of her house, load two lawnmowers into the back of a utility trailer attached to a pickup truck, and drive the truck and trailer across the street to a gas station. (*Id.*). She pumped

        gas into the two lawnmowers and then filled up a separate container of gasoline. (*Id.*). After leaving the gas station, Plaintiff drove the mowers to the New Richmond Cemetery, unloaded one of the mowers, and starting mowing the cemetery's grass. (*Id.*). Plaintiff was still mowing when Lt. Largent left Plaintiff at about 11:45 a.m. (*Id.* at 2). When he left, Lt. Largent recorded the license plate number on Plaintiff's truck, and after checking the Bureau of Motor Vehicles' records through the police computer, he confirmed that the vehicle was registered to Plaintiff and her husband. (*Id.*).

21. During his surveillance, Lt. Largent called Sowers twice to report Plaintiff's activities. (*Id.*). Pursuant to Sowers' request, Lt. Largent then drafted a written report of his observations, which he forwarded to Sowers. (*Id.*).

22. Based on Lt. Largent's report, Sowers determined that Plaintiff's requests for FMLA leave on October 6 and October 7 were fraudulent. (Sowers Aff. at ¶ 16). Working for profit while on approved FMLA leave violated the terms of the CBA and was a terminable offense.[3] (*Id.* at ¶ 17).

23. As such, Sowers decided to terminate Plaintiff. (*Id.*). After making her decision, Sowers contacted the Union representatives with the basis for her decision. (*Id.* at

---

[3] The court notes that Article IV, Section 15(f) states that an employee who works for profit while on an approved leave of absence shall lose his or her seniority rights and right to be on the seniority list, not be subject to termination or other disciplinary action. However, because Plaintiff has not challenged that a violation of Article IV, Section 15(f) is a terminable offense and the Union representative did not disagree with Sowers' reasons for terminating Plaintiff, the court will assume the CBA contemplates that where an employee works for profit without permission while on approved leave, that employee is subject to termination.

8

¶ 18).  The Union representatives did not object to her decision.  (*Id.*).

24. After returning from FMLA leave on October 10, 2005, Sowers informed Plaintiff of her termination, which became effective at the beginning of Plaintiff's shift starting October 7.  (*Id.* at ¶ 19).  Plaintiff's termination notice cited a violation of Article IV, Section 15(f) of the CBA, quoted above in Fact # 2.  (Termination Notice, Plaintiff's Ex. M).  The "Reasons and Remarks" section of her termination notice stated: "Management became aware on 10/07/05 that Ms. Vail was performing physical labor while on FMLA.  As a result of this action, Ms Vail's employment was terminated on 10/07/05 at 10:45 pm."  (Termination Notice).

25. Plaintiff did not file a grievance with the Union after she was terminated.  (Vail Dep. at 10).  Her Union representative said he would not file a grievance because Plaintiff would not win and her case was a "[c]losed, shut case."  (Vail Dep. at 114, 116).

26. Plaintiff filed a grievance with the National Labor Relations Board ("NLRB") on April 13, 2006, complaining that the Union did not file a grievance with Defendant to contest her termination.  (*Id.* at 112; *id.* at Ex. 23).

**IV.   Discussion**

    **A.   FMLA Claims**

        **1.   Return-to-work**

Plaintiff asserts that Defendant violated her substantive FMLA rights by not returning her to the position she held before taking intermittent FMLA leave in violation

of 29 U.S.C. § 2614(a)(1). When an eligible employee has taken FMLA leave for its intended purpose, that employee has the right: "(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, an employee taking FMLA leave is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). An employee's right to restatement is thus not absolute. *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001).

An employer has no obligation to return an employee to work who has misused his or her disability leave. *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006). "[E]ven an employer's honest suspicion that the employee was not using his medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim. *Id.*; *see also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680–81 (7th Cir. 1997).

In the present case, Plaintiff had been approved for intermittent FMLA leave for her high blood pressure and migraine headaches. During the summer of 2005, Defendant began to suspect that Plaintiff was improperly using her FMLA leave—taking FMLA leave to mow lawns for her husband's lawn-mowing business rather than because she was suffering from a migraine headache or effects of high blood pressure. Plaintiff had taken

thirty-three days of leave over a four-month period and was always absent for at least three consecutive days, which, to Defendant, seemed suspect.  As such, Defendant began an investigation into Plaintiff's use of her FMLA leave, which included surveillance of her activities when she was on leave.

On the morning of October 7, 2005, Sowers had decided to survey Plaintiff's activities after she utilized FMLA leave for her shift the night before and thus contacted the Crawfordsville Police Department.  Lt. Largent responded to the surveillance request and went to Plaintiff's house at 8:00 a.m. and saw Plaintiff load two lawnmowers into a trailer at 10:25 a.m., drive the trailer to a gas station to fill the lawnmowers with gasoline, and proceed to New Richmond Cemetery to mow the grass.  During this surveillance, Lt. Largent was in contact with Sowers and informed her of Plaintiff's activities.  Based on this surveillance, Sowers determined that Plaintiff was misusing her FMLA leave and therefore decided to terminate her.

Defendant's investigation of Plaintiff's activities "hardly looks world-class." *Kariotis*, 131 F.3d at 677.  Monitoring Plaintiff's activities after the shift for which she called in sick ended is not very probative to verify the legitimacy of Plaintiff's complaints when her shift would have started, especially considering the nature of Plaintiff's medical condition.  It is possible that Plaintiff would call in sick with a migraine headache before her shift started at 10:45 p.m., sleep through the night, and wake up the next morning

11

feeling fine.[4]

However, as discussed above, Defendant's honest, although poorly-supported, suspicion that Plaintiff was misusing her FMLA leave, is sufficient to support Plaintiff's termination. *Crouch*, 447 F.3d at 986. Plaintiff only argues that Defendant's suspicion was inaccurate, not that it was dishonest. *But see Kariotis*, 131 F.3d at 681 ("[Defendant] need not conclusively prove that [plaintiff] had misused her leave; an honest suspicion will do."). Further, the record in this case indicates Defendant's suspicion that Plaintiff was misusing her FMLA leave had some basis in fact. During the summer ("mowing") months of 2005, Plaintiff requested 33 days of FMLA leave for migraine headaches and/or high blood pressure. Defendant knew that Plaintiff worked a second job at her husband's mowing business. Although Plaintiff called in separately for each sick day, she was always off for at least three consecutive days at a time during this period. Lt. Largent observed Plaintiff, after calling in sick the night before, working the next morning for her husband's mowing business. That same morning, Dr. Hussain also faxed the note to Defendant stating that Plaintiff was to be on FMLA leave "till pm of 10/07/05." While Dr. Hussain later explained that note meant simply that Plaintiff could return to work the evening of October 7 and that Plaintiff was only to remain inactive for

---

[4] Although Plaintiff actually used FMLA leave for her October 6–7 shift because she had started new blood pressure medication, not because she was suffering from a migraine headache, the record does not indicate whether Defendant was aware of that reason. Plaintiff typically used FMLA leave because she was suffering from a migraine headache. Thus, the court will assume that Defendant treated Plaintiff's leave from her October 6–7 shift no differently than the other shifts she missed after calling in for FMLA reasons.

24 hours after taking her new medication, which period would have ended at approximately 9:30 a.m. the morning of October 7, Sowers did not have that information available to her at the time. Sowers interpreted that note to mean Plaintiff continued to be ill and would not be able to work her October 8 shift starting the evening of October 7. Considering this interpretation together with Lt. Largent's surveillance and the frequency of Plaintiff's absences during the same period that her husband's mowing business was operating, Defendant could honestly suspect that Plaintiff was not using her FMLA leave for its intended purpose. That is sufficient to defeat Plaintiff's claim under the FMLA that she was not returned to work after taking FMLA leave in violation of 29 U.S.C. § 2614(a)(1). Defendant's motion for summary judgment on Plaintiff's return-to-work claim under the FMLA is therefore **GRANTED**.

### 2. Contacting Dr. Hussain

Plaintiff's complaint also includes an allegation that Defendant violated the FMLA by contacting her treating physician, Dr. Hussain. The Federal Regulations supplementing the FMLA state: "If an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider." 29 C.F.R. § 825.307(a). However, Plaintiff concedes in her Response that she called Dr. Hussain's office requesting that it send a note to Defendant certifying her absence during her October 7 work day. (Plaintiff's Response at 7, Material Fact Not in Dispute # 35). The undisputed evidence shows that Defendant did not call Dr. Hussain's office. As such, Plaintiff's claim must fail, and Defendant's

13

motion for summary judgment on Plaintiff's claim against Defendant for improperly contacting her health care provider is **GRANTED**.

### 3. Retaliation

Plaintiff's complaint also alleges that Defendant retaliated against her for taking FMLA leave. Retaliation claims under the FMLA are distinct from substantive claims. *See King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). However, in response to Defendant's motion for summary judgment, which specifically addressed Plaintiff's retaliation claim, Plaintiff makes no mention of her retaliation claim. It is not the duty of the court to make parties' arguments for them. *See Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995). Further, a party opposing summary judgment waives claims to which it fails to respond on summary judgment. *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003). Because Plaintiff does not delineate her FMLA retaliation claim from her FMLA substantive claim, Defendant's motion for summary judgment on Plaintiff's retaliation claim is **GRANTED**.

### B. LMRA Claim

Plaintiff initially claimed that Defendant violated the LMRA by terminating Plaintiff without just cause under the CBA, but she withdrew that claim in her Response. Absent the withdrawal, the evidence indicates that Defendant would otherwise have been entitled to judgment on that claim.

Plaintiff did not dispute her termination with Defendant by filing a grievance as required by the CBA. Failing to follow the grievance procedure set forth in a collective

bargaining agreement precludes an employee from bringing a suit in federal court to challenge his or her termination. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563 (1976). While failing to exhaust one's remedies under a collective bargaining agreement may be excused where an employee can show that the union breached its duty of fair representation, *Id.* at 566 (citing *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)), Plaintiff has not set forth any evidence of such behavior by the union in this case. As such, Plaintiff is barred from challenging her termination under the CBA in this court.

## V.   Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Docket # 34) is **GRANTED** in its entirety.

**SO ORDERED** this 26th day of September 2007.

											_____
											RICHARD L. YOUNG, JUDGE
											United States District Court
											Southern District of Indiana

Electronic copies to:

Matthew S. Effland
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
matthew.effland@odnss.com

Todd J. Kaiser
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
todd.kaiser@odnss.com

Ronald E. Weldy
ABRAMS & WELDY
weldy@abramsweldy.com